ESTELLE F. GREENBERG, PLAINTIFF, v. ANTHONY C. MARTINI, CITY CLERK OF THE CITY OF PASSAIC, DEFENDANT.

Superior Court of New Jersey
Law Division

Decided May 23, 1975.

*Mr. Howard Stern* for plaintiff (*Messrs. Shavick, Stern, Schotz, Steiger & Croland,* of counsel).

*Mr. Joseph F. Scancarella* for defendant.

*Mr. Robert Kronman* for intervenor Robert Hare.

*Mr. August Michaelis* for intervenor Fred Kuren.

*Mr. Walter Tencza* for intervenor John Salek.

*Mr. Marvin Stern* for intervenor Margie Semler.

JOELSON, A. J. S. C. This is an action in which plaintiff seeks to require a run-off election for four councilman-at-large positions in the City of Passaic. Plaintiff finished in fifth place in an election for four positions of councilman-at-large. The candidates who finished in the first four places have been permitted to intervene under *R.* 4:33–1.

There is no dispute as to the facts in the case. The City of Passaic operates under Council-Mayor Plan B, as provided by *N. J. S. A.* 40:69A–49. At an election held on May 13, 1975 for the four positions of councilman-at-large 9,414 persons were recorded as having entered and left the voting booths and 70 as having cast absentee ballots, making a total of 9,484. There were 11 candidates on the ballot. The one who attained the highest number of votes received 3,788, and the second highest received 3,720. All the 11 candidates together received an aggregate vote of 27,948, which figure is obtained by adding all the votes recorded by all the candidates. Other than the 11 candidates contesting for the four positions of councilman-at-large, there were no other candidates on the ballot since no offices other than these four councilman-at-large positions were to be elected.

The city clerk has declared that it is his intention to certify that no run-off election will be required, based upon his finding that four candidates have received a majority under a formula provided by *N. J. S. A.* 40:69A–160(d) for cases where no suitable counters have been provided or the tally of the number of voters cannot be determined. It is this determination that is challenged by plaintiff.

*N. J. S. A.* 40:69A–160 (d) provides that "if four councilmen at large are to be elected and 2 or more candidates for said office receive a majority of the votes cast, the 4 candidates receiving the greatest number of votes shall be elected." The statute then goes on to make the following provision, upon which the outcome of this case hinges:

As used in this section, the number constituting a majority of the votes cast shall be computed by dividing by 2 the number of voters

who cast a vote for at least one candidate for councilman at large, and then adding one. Voting machines to be used in such election shall be equipped, as soon as practicable with one or more counters so connected as to keep a tally of the number of voters who cast votes for one or more of the candidates for councilman at large. Until such time as suitable counters have been so provided, or whenever the tally of the number of voters cannot be determined for any reason, then the number constituting said majority of the votes cast shall be computed by adding all the votes cast for each candidate for said office, dividing that total by twice the number of councilmen at large to be elected and then adding one.

It is uncontroverted in this case that the voting machines used in the Passaic election had public counters to record the number of voters who entered the voting booths, and also counters to record the number of votes accorded each candidate. It is also agreed that there were no other special or additional counters. The Passaic County Superintendent of Elections testified that the voting machines used in the Passaic election were so devised that once a person entered a voting booth and pulled the handle to close the booth's curtain, the handle could not be moved to open the curtain unless a lever over the name of at least one candidate had been depressed. The Superintendent added, however, that it was possible for a voter to depress such lever over a candidate's name, restore it to its original position and then move the handle which controlled the curtain for exit.

It is the opinion of the court that even without special or additional counters, one can ascertain the number of votes that would constitute a majority "by dividing by two the number of voters who cast a vote for at least one candidate for councilman at large, and then adding one." 9,414 persons were recorded on the public counters. The only position for which they could have voted was councilman-at-large since no other position (or question) was on the ballot. Thus, the highest candidate having received only 3,788 votes, neither of the two leading candidates can be said to have garnered a majority of the votes cast.

Defendant and intervenors contend, however, that the public counters only disclose how many people entered and left the voting booths, but that we are left in the dark as to how many actually voted for at least one candidate. Accordingly, they urge that the court utilize the alternative method provided by the last sentence of *N. J. S. A.* 40:69A–160 quoted above, and compute a majority "by adding all the votes cast for each candidate for said office, dividing that total by twice the number of councilmen at large to be elected and then adding one", which was the formula employed by the city clerk.

The court is of the opinion that this formula need only be called into use when the presence on the ballot of another office (such as mayor) makes it impossible to ascertain the number of voters who cast a vote for at least one candidate for councilman-at-large. Since the only votes that could possibly be cast were for the office of councilman-at-large, there were "suitable counters" and thus it cannot be held that the tally of the number of voters who cast a vote for at least one candidate cannot be determined.

The contention of defendant and intervenors is that persons may have failed to vote after having entered the voting booths, and have pointed to other elections on public questions in Passaic in 1949 and other municipalities since then where tallies show that a small percentage of persons did so. The court has not studied the prolixity of the public questions involved nor the familiarity of the electorate with the use of voting machines in those instances. However, it seems logical to presume that voters who entered the voting booths voted for at least one candidate before leaving. Why else would they enter? One can always contrive possibilities which fly in the face of logic, but common sense rather than strained legalisms should still be the guide. Absent any proof to the contrary, the court must assume that if indeed any of the persons counted failed to vote, such number would be so minimal as to be insignificant. This is especially so in

view of the elaborate procedure described by the superintendent of elections as necessary to effect egress from the booths without actually voting.

In this context, it must be kept in mind that under *N. J. S. A.* 40:69A–160(d) two or more candidates must receive a majority if the four candidates receiving the greatest number of votes are to be declared elected. The first two highest candidates received 3,788 and 3,720 votes respectively. Thus, in order for 3,720 to be regarded as a traditional majority, only a mere 7,439 or less voters could have voted for at least one councilman-at-large. Since 9,484 were recorded on the public counters and absentee ballots, we would have to conclude that 2,045 of those on the public counters failed to vote in order to get down to the figure of 7,439 voters. It seems entirely unrealistic that 2,045 people (or more than 20%) who were registered on the public counters would fail to cast a vote for any of the available candidates for councilman-at-large. It is the opinion of the court that candidates who have not achieved a majority in the accepted mathematical manner should not be permitted to do so by resorting to a stand-by method through a fanciful supposition of mass non-voting by those recorded on the public counters.

The only reported case which appears to have interpreted the statute in question is *Trugman v. Reichenstein,* 27 *N. J.* 280 (1958). This case is not entirely helpful because it involved a situation in which there were other offices than councilman-at-large on the ballot and also because it was decided before the statute was amended to its present form. However, there is some advice of a philosophical nature contained in that opinion which bears repeating here. In ruling in favor of plaintiff, who sought a run-off, the Court said:

It may be added that if a doubt lingered, it should be resolved in favor of plaintiff's position. The Legislature sought to insure a decisive verdict at the polls. Hence the provision for a run-off. If we were uncertain as to the legislative will, we should lean to a construction which would guarantee that we are not requiring less than the Legislature intended.

■ That case affirmed an Appellate Court decision, *Trug-man v. Reichenstein*, 50 *N. J. Super.* 377 (App. Div. 1958), in which the court stated:

From the reading of the entire Faulkner Act it is apparent that one of the ends the Legislature had in mind was to eliminate as far as possible the rule of municipalities by officials elected by a minority vote. . . The clear and definite aim of the statute is to obtain insofar as possible the election of candidates by a majority vote.

This court reads this language to suggest that in the event any doubt should exist, it should be resolved in favor of requiring an actual majority whenever such can reasonably be determined rather than the last resort artificial "majority" provided by statute in such cases where a true majority is not possible to be ascertained. When reasonably determinable, an actual majority is to be preferred to a "majority" which is considerably less than one-half, and which is not a majority at all.

The court finds that no candidate received the majority mandated by *N. J. S. A.* 40:69A–160 and directs that a runoff be conducted pursuant to *N. J. S. A.* 40:69A–161.